UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DESMOND HINDS,

                Plaintiff,

             v.

COUNTY OF WESTCHESTER, *et al.*,

                Defendants.

No. 11-CV-7265 (KMK)

ORDER

KENNETH M. KARAS, United States District Judge:

Before the Court is its Order of June 27, 2018 (the "OSC"), which required Plaintiff's counsel Bonita E. Zelman to show cause why she should not be sanctioned by the Court for her misconduct at trial. (*See* Order ("OSC") (Dkt. No. 437).) For the reasons that follow, the Court's OSC is withdrawn.

## I. Background

Plaintiff, Ms. Zelman's client, was awarded a jury verdict of $200,000 after a five-week trial that spanned May and June of 2018. (Verdict Form (Dkt. No. 438).) During the course of the trial, Ms. Zelman's conduct caused the Court on at least four separate days to threaten to impose sanctions. (T.R. 2398–99, 3275, 3277, 4434, 4892–93.)[1] It also prompted defense counsel to request sanctions, (*id.* at 4885), and separately describe Ms. Zelman's conduct as "sanctionable," (*id.* at 3275). On June 27, 2018, the Court issued the OSC requiring Ms. Zelman to show cause why she should not be sanctioned. (OSC.) The Order noted in particular Ms. Zelman's "(i) repeated and blatant disregard of the Court's orders regarding the scope of

---

[1] Citations to "T.R." refer to the trial transcript.

questioning and other evidentiary issues; (ii) failure to abide by the Court's rulings on multiple Motions in Limine; (iii) refusal to comply with the Federal Rules of Evidence through her repeated use of leading questions and reading from documents not in evidence; (iv) reading from, and directly quoting, a document not in evidence during her summation; and (v) inappropriately gesturing toward her client during her cross-examination of a witness." (*Id*. at 1.)[2]

On June 29, 2018, the Court set July 27, 2018 as the deadline for Ms. Zelman's submission in response to the OSC. (Dkt. No. 439.) In response to a second submission by Ms. Zelman's retained professional responsibility counsel, the Court on July 23, 2018 extended this deadline to August 17, 2018. (Dkt. No. 445.) On August 16, 2018, Ms. Zelman submitted an opposition brief, her own declaration, and a declaration by Bruce A. Green, a Professor at Fordham Law School. (Bonita Zelman's Mem. of Law in Resp. to this Court's OSC ("Zelman's Mem.") (Dkt. No. 455); Decl. of Bonita E. Zelman, Esq. ("Zelman Decl.") (Dkt. No. 456); Decl. of Bruce A. Green, Esq. ("Green Decl.") (Dkt. No. 457).)

Based on these submissions and the trial transcript, the Court makes the following findings regarding Ms. Zelman's conduct.

---

[2] The OSC also raised potential improper compensation for an expert witness. Dr. Rembar took liens against the recovery of five of Ms. Zelman's clients, (T.R. 2192, 2199–2200, 2212–13, 2230, 2241–42, 2265), and testified that he had "a financial stake" in the outcome of the trial, (*id*. at 2265; *see also id*. at 2268, 2343). The Court makes no finding that these liens were proper, but concludes that facilitating them was not sanctionable misconduct. The Eighth Circuit has ruled that, because witnesses like Dr. Rembar remain entitled to payment for treatment provided regardless of the outcome of the case, the liens "fail to establish that the payment of the medical services was contingent on a favorable outcome in the litigation." *Taylor v. Cottrell, Inc.*, 795 F.3d 813, 818 (8th Cir. 2015). Separately, such liens are "not uncommon." *Id*. at 819 (collecting cases); *see also Parker v. Bulik*, No. 11-CV-5412, 2017 WL 3396440, at *19 (E.D.N.Y. Aug. 5, 2017) ("[I]t is not impermissible under the law for a medical professional to place a lien on an award or settlement for payment for services rendered to a plaintiff for required treatment . . . .").

A. Disregard of Court Orders

Ms. Zelman repeatedly disregarded court orders. The Court notes five instances that exemplify this pattern. (*See* T.R. 4434 ("Anybody who reviews this transcript needs to review the whole thing because you don't get a flavor for just how flagrant your disregard has been for my rulings. Clear[] and unequivocal rulings that you just repeatedly ignore, on top of which you have asked, on numerous occasions, questions in bad faith knowing that they were objectionable, but you didn't care.").)

First, Ms. Zelman disregarded the Court's order not to solicit testimony about whether medical treatment was provided to Mr. Henry, the individual whose shooting death indirectly gave rise to the claims of Ms. Zelman's clients. Before the jury was seated, defense counsel stated that he would "be continuing to object to any evidence about medical aid that [officers] didn't provide [to Mr. Henry]." (*Id*. at 4316.) The Court responded: "All right. Noted." (*Id*.) Ms. Zelman said nothing at the time, (*id*.), but within minutes violated the Court's directive, asking the witness Mr. Cusano: "you did not see any officers giving medical aid to [Mr.] Henry, right?", (*id*. at 4347). The Court found "implausible on its face" Ms. Zelman's statement that she "didn't attempt to flout an order of the Court." (*Id*. at 4433.)

Ms. Zelman argues that the Court's rulings on this issue were complex, and that she acted in good faith and violated the Court's order only mistakenly.[3] The complexity of prior rulings is

---

[3] Contrary to Ms. Zelman's position that "an objective observer might conclude that the Court made complex and highly nuanced instructions," (Zelman Mem. 17), the Court's instructions on this point were clear throughout the trial. Testimony about whether Mr. Henry received medical attention could be admitted only: (1) as the jury was instructed, "to provide [the jury] with the entirety of the witness[es]' memories; the narrative of what happened that night," (T.R. 1119; *see also id*. at 638, 1371), and (2) to consider the possible emotional or psychological trauma experienced by Mr. Hinds, but not by any of the other Defendants, (*id*. at 1393–94; *see also id*. at 1099–1100.) Further, the Court held in ruling on a motion in limine and reiterated at trial that no evidence of Mr. Henry's lack of medical attention could be admitted to

3

irrelevant, because defense counsel acknowledged these prior questions in the colloquy, (*id.* at 4316), the Court ruled, and Ms. Zelman nonetheless violated that order "minutes" later, (*id.* at 4433).[4] The Court's language—"[n]oted"—did not suggest that it was reserving a ruling until the question was asked before the jury. (*Id.* at 4316.) As the Court clarified throughout the trial, "[t]here is no such thing as trial by surprise." (*Id.* at 1378; *see also id.* at 425.) The purpose of colloquies while the jurors are not present is "so [the Parties and the Court] don't have these dialogues in front of the jury and waste their time." (*Id.* at 425.) Rather than waiting, asking the question, and drawing an objection, Ms. Zelman "in that moment, when [defense counsel] says we're not going to have inquiry about Mr. Henry, . . . should have stood up and said, no, here's why I get to do that." (*Id.* at 4892–93.) She did not.[5]

Ms. Zelman returned to this very line of questioning two days later, and one day after submitting a letter arguing that she should not be sanctioned for her question of Mr. Cusano. (*See* Dkt. No. 456-6.) Ms. Zelman asked Mr. Jacobsen on cross examination: "[W]hen you went over to [Mr. Henry] and you saw [two officers] standing by him, they were not attending to him

---

justify the Plaintiffs failing to comply with a police order. (*Id.* at 52, 638.) Where the Court permitted Ms. Zelman to ask witnesses about whether medical attention was provided to Mr. Henry, it was during direct examination, as part of their narrative of events. (*Id.* at 400, 985–86.) Even in this context, the Court limited the testimony, striking Mr. Cox's testimony about Mr. Henry's condition, (*id.* at 400), and allowing only one narrow question regarding Mr. Gagnon's perception of whether medical attention was provided, (*id.* at 985–86). Defense counsel did not open the door to further questions on this topic by eliciting testimony on direct examination about general crime scene medical procedures, (*id.* at 3357), or about the psychological effect on Plaintiffs of Mr. Henry's death compared to the effect of their interactions with Defendants, (*id.* at 1520–21; *see* Zelman Mem. 16).

[4] Because Ms. Zelman violated the order shortly after it was issued the high volume of rulings on motions in limine is irrelevant. (Zelman Mem. 18.)

[5] Ms. Zelman disregarded this order on June 7, 2018, more than a month after the trial began. (*See* T.R. 5, 4774). Thus, the eve of trial settlement does not suggest that this was merely a good faith mistake. (Zelman Mem. 18.)

4

in any way, correct?", (T.R. 4792), and "Did you see either [of the two officers] attending to [Mr.] Henry?", (*id*. at 4794). Each of these questions attempted to elicit testimony to confirm that the officers provided no medical attention, and the Court sustained objections to both. (*Id*.) Her return to this line of inquiry further suggests a lack of good faith.

Second, and relatedly, Ms. Zelman ignored a Court order not to solicit testimony about whether Mr. Henry was handcuffed while on the ground. The Court ruled in a colloquy without the jury that Ms. Zelman could not ask her witness Mr. Gagnon about handcuffing Mr. Henry, because the prejudice of that question substantially outweighed its probative value under Rule 403. (*Id*. at 775–78.) Ms. Zelman at least twice violated this instruction, including once the day immediately following the colloquy. (*Id*. at 1003; *see also id*. at 4792.)

Third, Ms. Zelman ignored a pretrial order precluding evidence that police officers laughed at the incident, (*id*. at 1555–56, 1563–64), which required a curative instruction, (*id*. at 1589–90).[6]

Fourth, Ms. Zelman multiple times ignored the Court's instruction not to solicit hearsay testimony about medical tests from an expert witness. (*Id*. at 2393–95, 2409–11, 2416, 2496–97.)

Fifth, Ms. Zelman, without explicit reference, improperly quoted defense counsel's opening statement to her witness, (*id*. at 1347), "directly circumventing a ruling from the Court," (*id*. at 1380).

---

[6] While the Court did not recall this pretrial order and incorrectly overruled an objection to this testimony, this does not excuse Ms. Zelman's behavior.

B. Improper Questions

Ms. Zelman repeatedly asked improper questions despite numerous court orders. This pattern includes improper leading questions, improper argument, asked and answered questions, and questions asked without good faith. (*See id*. at 4893 ("I don't know how many cases I've tried in this job and in my last job. I've never seen anything like this. Never. An attorney just deliberately decides to flout the rules of evidence and court rulings. I've never seen anything like this.").)

First, Ms. Zelman asked improper leading questions. Federal Rule of Evidence 611(c) states that "[l]eading questions should not be used on direct examination except as necessary to develop the witness's testimony." Fed. R. Evid. 611. Ms. Zelman repeatedly violated this Rule by asking her witnesses leading questions. (*See, e.g.*, T.R. 233–34, 271, 277–78, 391–92, 1196, 1203–04, 1210, 1293, 1313, 1314, 1329, 1330, 1340–41, 1525, 1527, 1531, 1596, 1609, 1840, 1841, 1853, 1854, 1857, 1863, 1867, 1991, 2018, 2373, 2414, 2609–10, 2790.) The Court described a "repeat pattern," where "[Ms. Zelman] ask[ed] [a] leading question. Counsel object[ed]. [The Court] sustain[ed]. The witness ha[d] the answer. Then [Ms. Zelman] ask[ed] a non-leading question, and it defeat[ed] the purpose of the prohibition against the leading questions." (*Id*. at 2044; *see also id*. at 1314, 1525–26, 1596–97, 1991, 2373.) The Court repeatedly admonished Ms. Zelman for her behavior, noting that it was "becoming a pattern," (*Id*. at 1341), and stating "[y]ou will not ask your client leading questions . . . [o]r I will consider appropriate remedies," (*Id*. at 1527; *see also id.* at 1840, 1857, 2045, 2373). As the Court noted, Ms. Zelman asked "[n]ot a single leading question of Mr. Garcia," (*id*. at 1562), showing that "when [she] decide[d] [she] want[ed] to comply with the rules, [she] d[id]," (*id*. at 2045).

6

Second, Ms. Zelman repeatedly offered inappropriate argument. Federal Rule of Evidence 611(a) authorizes the Court to "exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth; . . . and (3) protect witnesses from harassment or undue embarrassment." Fed. R. Evid. 611. Pursuant to this Rule, courts regularly sustain objections "that a particular question is argumentative." *United States v. Yakobowicz*, 427 F.3d 144, 151 (2d Cir. 2005). Throughout the trial, the Court repeatedly advised Ms. Zelman that she could "not use questioning as a means of argument." (T.R. 904; *see also id*. at 912, 2827, 2840, 4826, 4864, 4884.) Ms. Zelman repeatedly violated this order by making inappropriate argument. This began in her opening statement, where Ms. Zelman at least twice presented argument rather than describing what the evidence would show. (*See id*. at 64, 67.) The pattern continued with Ms. Zelman inappropriately characterizing Defendants' alleged actions while examining her witnesses, (*see id*. at 571 (asking the witness about "being brutalized"), 883 (referring to "the assault and battery")), and inappropriately characterizing defense counsel's questions, (*see id*. at 577 (counsel "went on and on"), 1723 (counsel "kept asking you over and over")). Ms. Zelman's violations of this clear court order were the most numerous while she examined Defendants' witnesses. (*See id.* at 903–04, 912, 934, 949, 1015, 2827, 2840, 3228–29, 3246–47, 4810–11, 4826, 4829, 4864, 4884.) The Court found that she asked at least one question for no purpose other than to improperly influence the jury, or "to get that thought out there in the jury's head." (*Id*. at 3274.)

Third, Ms. Zelman wasted the jury's time with numerous asked and answered questions. Federal Rule of Evidence 611(a) authorizes the Court to "exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to . . . (2) avoid wasting

7

time . . . ." Fed. R. Evid. 611.  Consistent with the "wide latitude" afforded district courts, *Manley v. AmBase Corp.*, 337 F.3d 237, 247 (2d Cir. 2003), the Court repeatedly advised Ms. Zelman to stop her "pattern" of "wast[ing] time" by asking redundant questions, (T.R. 4551, *see also id.* at 4436–37).  Ms. Zelman ignored this order, many times repeating questions.  (*Id*. at 4331–32, 4341, 4365, 4369, 4375, 4380, 4383, 4387, 4389, 4390, 4391, 4397, 4511, 4525, 4538, 4540, 4608, 4669–70, 4673, 4701, 4702, 4706, 4709, 4711, 4718, 4720, 4721, 4792, 4807, 4809, 4819, 4820, 4829, 4864, 4871, 4880, 4932, 4937.)

Fourth, Ms. Zelman asked numerous questions without good faith, including inappropriately inflammatory questions.  These questions violated the provision of Rule 611(a) that requires that procedures for examining witnesses be "effective for determining the truth." Fed. R. Evid. 611.  The Court identifies five examples.  First, Ms. Zelman elicited testimony that her clients were "proven innocent" of criminal charges, when in fact the case against them was dismissed by prosecutors.  (T.R. 1875–78.)  The Court found that Ms. Zelman "knew that [this testimony] was coming" and "had an obligation to make sure [her] client didn't say that."  (*Id*. at 1876.)  This testimony required a series of curative instructions.  (*Id*. at 1877–78, 2072–74.) Second, Ms. Zelman improperly read from the autopsy of Mr. Henry that his death was a "homicide."  (*Id*. at 1800.)  Ms. Zelman willfully read the coroner's "legal conclusion as to responsibility for the death" despite her knowledge that homicide was not a mere medical description of a cause of death, and "that the cause of death wasn't in dispute."  (*Id.* at 2129.) This, too, required a curative instruction.  (*Id*. at 2925–26.)  Third, Ms. Zelman elicited emotional testimony about her client Mr. Romanick's relationship with Mr. Henry.  (*Id*. at 2010–11.)  This testimony was highly prejudicial, and Ms. Zelman knew it was irrelevant due to the Court's prior ruling that only one of Ms. Zelman's seven clients—Mr. Hinds—could recover for

8

emotional damages based on what happened to Mr. Henry.  (*Id*. at 1393–94.)  The Court found that Ms. Zelman was "responsible for [her] witness" and could have prepared him to avoid testimony to this effect "weeks ago."  (*Id*. at 2063–64.)  This line of questioning also required a curative instruction.  (*Id*. at 2074–75.)  Fourth, Ms. Zelman asked questions calling into question the chain of custody of toxicology reports showing that Mr. Henry had an elevated blood alcohol content at the time of his death.  (*Id*. at 1802–05.)  In fact, the Henry family hired its own toxicologist, who reached the same conclusion, and the family did not contest this finding in litigating their case on behalf of their son.  (*Id*. at 1939.)  Ms. Zelman was aware of this separate test; indeed, she moved in limine to keep it out of evidence.  (*Id*. at 1941–42.)  Ms. Zelman did none of her own investigation of the validity of the toxicology report, yet with "no good-faith basis" badgered a witness who was unable to answer chain of custody questions.  (*Id*. at 1941–45.)[7,8]  Fifth, Ms. Zelman asked a defense witness "as a witness you felt you needed an attorney here today?", the Court instructed Ms. Zelman that this line of inquiry was "inappropriate," and Ms. Zelman apologized.  (*Id*. at 895.)  Notwithstanding this apology, Ms. Zelman twice more asked questions about the witness's attorney, (*id*. at 897, 935), even though the Court had "made . . . clear" that these questions were inappropriate, (*id*. at 935).

---

[7] Even more egregious, defense counsel represented that Ms. Zelman had been provided the chain of custody report in discovery, though Ms. Zelman disputed this fact.  (T.R. 2123–25.)

[8] This behavior is consistent with a string of objections regarding the relevance of Mr. Henry's toxicology report, (*see* T.R. 1627, 1629, 1930), which were "frivolous" and effectively amounted to "[t]hat evidence is really good for the other side, so I don't want it in," (*id*. at 1731).  That Ms. Zelman's improper conduct focused on these toxicology reports further suggests a lack of good faith.

9

C. Additional Misconduct

The Court highlights three additional instances of Ms. Zelman's misconduct and apparent misconduct. First, Ms. Zelman twice cited evidence not in the record in her summation. (*Id*. at 5156, 5158.) This required a curative instruction. (*Id*. at 5187.) Ms. Zelman accurately notes that she immediately apologized, (*id*. at 5186), claims that she thought the documents were in evidence, (*id*.), and states that her error was the result of being "overwhelmed by the large number of exhibits," as well as "fatigue and the complexity of the case," (Zelman Decl. ¶ 13). At the same time, Ms. Zelman acknowledges "the duty of a competent trial lawyer to keep track of admitted exhibits." (*Id*.)

Second, Ms. Zelman is credibly accused of inappropriately looking at and gesturing to her client during cross-examination. Defense counsel alleged that, after their witness Mr. Jacobsen answered a question consistent with his deposition testimony, Ms. Zelman "slowly turned, very deliberately, . . . and looked at [her client] as if to say [']can you believe this[?][']" (T.R. 4893.) Defense counsel claimed that this was "nothing more than a preplanned stunt that she played in front of this jury," and moved for Ms. Zelman to be sanctioned. (*Id*. at 4885.) After a break, the Court noted that "[t]here's corroboration for what [defense counsel] represented by somebody from chambers staff." (*Id*. at 4896.) Ms. Zelman denies gesturing but admits recalling that she "did look at [her] client who was sitting in the first row for less than one second during the cross-examination of Officer Jacobsen." (Zelman Decl. ¶ 30.)

Third, contrary to Ms. Zelman's representation that she "dutifully appeared in court on time," (Zelman Decl. ¶ 34), she in fact failed to appear on time at least twice, (T.R. 1268).

II. Analysis

"A district court has the inherent authority to sanction parties appearing before it for acting in bad faith, vexatiously, wantonly, or for oppressive reasons." *In re Ski Train Fire in*

10

*Kaprun Austria on Nov. 11, 2000*, No. 03-CV-8960, 2007 WL 2398697, at *5 (S.D.N.Y. Aug. 16, 2007) (citation and quotation marks omitted). "This authority stems from the very nature of the courts and their need to be able to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Id*. (citation and quotation marks omitted). These inherent powers "must be exercised with restraint and discretion." *Chambers v. NASCO, Inc*., 501 U.S. 32, 44 (1991). District courts' decisions to impose sanctions pursuant to their inherent powers are reviewed for abuse of discretion. *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 71, 78 (2d Cir. 2000). When courts impose sanctions under these circumstances, "a finding of bad faith on the part of the attorney is essential to a finding of contempt." *In re Pennie & Edmonds LLP*, 323 F.3d 86, 90 (2d Cir. 2003). "An attorney whom the court proposes to sanction must receive specific notice of the conduct alleged to be sanctionable and the standard by which that conduct will be assessed, and an opportunity to be heard on that matter, and must be forewarned of the authority under which sanctions are being considered, and given a chance to defend h[er]self against specific charges." *Sakon v. Andreo*, 119 F.3d 109, 114 (2d Cir. 1997) (citation and quotation marks omitted).

District courts have sanctioned attorneys for their misconduct at trial. *See, e.g.*, *Stuart v. Kempthorne*, No. 99-CV-8163, 2007 WL 2071605 (E.D.N.Y. July 13, 2007). While Ms. Zelman correctly argues that her misconduct does not perfectly replicate that of the attorney in *Stuart*, (Zelman Mem. 22), there are numerous notable similarities. For example, counsel in *Stuart* "flagrantly disregarded th[e] [c]ourt's rulings, and, thus, exhibited an extraordinary disdain for th[e] [c]ourt and the integrity of the proceedings in this action." *Stuart*, 2007 WL 2071605 at *13. This included "intentionally violat[ing] th[e] [c]ourt's rulings prohibiting inquiries into certain [topics]," *id*. at *14, and "continuously s[eeking] to reargue the [c]ourt's rulings, even

11

where such rulings were made clear," *id*. at *21.  As discussed, Ms. Zelman persistently committed similar misconduct.  (*See* T.R. 4434.)  Further, in some respects Ms. Zelman's misconduct was worse than counsel in *Stuart*.  For example, there is no indication that counsel in *Stuart* violated the Rules of Evidence as persistently or as flagrantly as did Ms. Zelman.  (*See* T.R. 4893.)

But for the passage of time—trial concluded over two years ago—and prior resolution of fee disputes, (*see* Dkt. Nos. 494, 514), the Court would impose "very serious sanctions against [Ms. Zelman]," (T.R. 4434).  *Cf. Raghavendra v. Trustees of Columbia Univ. in the City of N.Y.*, No. 06-CV-6841, 2017 WL 6000553, at *3 (S.D.N.Y. Dec. 1, 2017) ("[T]he passage of time has diminished the effectiveness of the proposed [monetary] sanction.").  Nonetheless, because of the egregiousness and persistence of Ms. Zelman's misconduct, the Court will send this Order to the Committee on Grievances of the Southern District of New York and to the Disciplinary Committee of the New York State Judicial Department in which Ms. Zelman is admitted to practice for such action as they deem proper, and will upon their request make available a transcript of the trial.

### III.  Conclusion

For the foregoing reasons, the Court withdraws its Order.  (Dkt. No. 437.)  The Clerk of the Court is respectfully requested to forward a copy of this Order to the Committee on Grievances of the Southern District of New York and to the Disciplinary Committee of the New York State Judicial department in which Zelman is admitted to practice.

SO ORDERED.

DATED:    December 1, 2020
          White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE